O

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

BCS BUSINESS CONSULTING
    SERVICES PTE. LTD., a
Singaporean company,

        Plaintiff,

    v.

MICHAEL A. BAKER, individually
    and in his capacity as Executor of the
Estate of Chantal Burnison;
BCS PHARMA CORPORATION, a
    California corporation;
HEIKA BURNISON, an individual;
BIRKA BURNISON, an individual;
GREY PACIFIC LABS, LLC, a
    Delaware limited liability company;
    and
GREY PACIFIC SCIENCE, INC., a
    Delaware corporation,

        Defendants.

Case No. 2:19-cv-06914-JWH-JPR

**ORDER DENYING PLAINTIFF'S
MOTION FOR AN ANTI-SUIT
INJUNCTION [ECF No. 193]**

# I.  SUMMARY OF DECISION

Before the Court is the motion of Plaintiff BCS Business Consulting Services Pte. Ltd. for an anti-suit injunction against Defendant Michael Baker.[1]  Specifically, BCS seeks to enjoin Baker from enforcing the injunction of the Singapore International Commercial Court (the "SICC") pending this Court's decision on Baker and his co-Defendants' motion for summary judgment.  After considering the papers filed in support of and in opposition to the Motion,[2] as well as the arguments of counsel at the hearing, the Court orders that BCS's Motion is **DENIED**, for the reasons set forth herein.

# II.  BACKGROUND

## A.    The 1999 Bankruptcy Case and the Disputed Ethocyn-Related Rights

According to BCS, the legal saga between BCS and Baker traces its origins to two bankruptcy cases filed in 1999 in the U.S. Bankruptcy Court for the Central District of California (jointly, the "Bankruptcy Case"), which involved Chantal Burnison and her companies, debtors Chantal Pharmaceutical Corporation and Chantal Skin Care Corporation.[3]  In the Bankruptcy Case, New Zealand-based Renslade Holdings Limited ("Renslade NZ") purchased from the debtors the rights to a compound called "Ethocyn," which was used in skincare products.[4]  Chantal Burnison claimed that the use of Ethocyn makes one's "skin look younger and firmer."[5]

In that transaction—which the Bankruptcy Court approved in October 1999—Renslade NZ acquired all rights to Ethocyn through an asset purchase agreement[6] among

---

[1]     Pl.'s Mot. for an Anti-Suit Inj. (the "Motion") [ECF No. 193].

[2]     The Court considered the documents of record in this action, including the following papers:  (1) Third Am. Compl. (the "Amended Complaint") [ECF No. 122]; (2) Motion (including its attachments); (3) Defs.' Opp'n to the Motion (the "Opposition") [ECF No. 196]; (4) Pl.'s Reply in Supp. of the Motion (the "Reply") [ECF No. 200]; (5) Pl.'s Supplemental Brief ("BCS's Supplemental Brief") (including its attachments) [ECF No. 211]; and (6) Defs.' Supplemental Brief ("Defendants' Supplemental Brief") (including its attachments) [ECF No. 214].

[3]     See Amended Complaint ¶ 13.  The Bankruptcy Case was pending as Case Nos. 2:99-bk-15936 and 2:99-bk-19412.

[4]     Id. at ¶¶ 14-19.

[5]     Id. at ¶ 13.

[6]     See Defs.' Mot. for Summ. J, Joint, Ex. 3 (the "Sale Agreement") [ECF No. 184-12].

the debtors, the creditors' committee, and Renslade NZ.[7]  In May 2000, Renslade NZ transferred those Ethocyn-related rights to Renslade Holdings Pte. Ltd., a Singapore Incorporated Company ("Renslade SG").[8]  BCS, in turn, acquired those rights from Renslade SG in April 2002.[9]  Renslade NZ, Renslade SG, and BCS were all owned by Marcus Weber.[10]  Later that same month, the rights to Ethocyn were once again transferred—this time to Renslade Holdings Hong Kong ("Renslade HK"), another company owned by Weber.[11]

BCS claims that in May 2016, shortly before her death, Chantal Burnison met with Weber and discussed extending a supply agreement with NSE Products, Inc., f/k/a Nu Skin International, Inc. ("NSE").[12]  BCS alleges that Baker, who would later act as the executor of Burnison's estate, was present at that meeting.[13]  BCS contends that Chantal Burnison informed Weber that she wanted her daughters, Heika and Birka Burnison,[14] to benefit from Ethocyn-related business in the future.  To further those ends, Weber and Chantal Burnison coordinated the designation of Weber as the first beneficiary of an incorporated foundation (the "Amarillis Foundation") that owned all shares of Renslade HK, with Chantal Burnison's daughters as the second beneficiaries of the foundation.[15]

Through a subsequent amendment of the foundation's regulations, all of the outstanding shares of Renslade HK were donated to the Amarillis Foundation.[16]  Weber declared that he would renounce his rights as the first beneficiary of the Amarillis Foundation in the event of his death.[17]  BCS claims that as a result of those transactions, the Amarillis Foundation became the sole shareholder of Renslade HK and the beneficial owner of bank accounts in Singapore and Switzerland in the name of Renslade HK.[18]  The

---

[7]    *Id.* at ¶ 19.

[8]    *Id.* at ¶ 21.

[9]    *Id.*

[10]   *Id.*

[11]   *Id.* at ¶ 23.

[12]   *Id.* at ¶ 27.

[13]   *Id.*

[14]   The Court will refer to Heika and Birka Burnison to by their first names for clarity.  No disrespect is intended.

[15]   Amended Complaint ¶ 28.

[16]   *Id.* at ¶ 30.

[17]   *Id.*

[18]   *Id.* at ¶ 31.

rights to Ethocyn were then held by BCS, and the proceeds thereof were held by Renslade HK—now beneficially owned by the Amarillis Foundation.[19]

Chantal Burnison passed away in October 2016.[20]  Heika and Birka incorporated Grey Pacific Science ("GPS") that same month, and BCS asserts that GPS wrongfully began to collaborate with Baker and Defendant BCS Pharma Corporation—the manufacturer of Ethocyn and a supplier to NSE—"to facilitate the fraudulent conveyance of [BCS's] intellectual property and business earnings away from [BCS]."[21] The crux of BCS's allegations is that Baker and GPS wrongfully patented the means to produce Ethocyn and ultimately cut BCS out of business relationships relating to Ethocyn sales.[22]  BCS alleges that Baker redirected payments from NSE to Defendant BCS Pharma and misrepresented to NSE that those payments were going to Plaintiff BCS.[23]

## B.    The Singapore Action

Baker filed a lawsuit against BCS, Weber, and Renslade HK (the "Singapore Defendants") in November 2017 in the Singapore High Court, which is Singapore's court of general jurisdiction for civil cases.[24]  The action was subsequently transferred to the SICC, which is a hybrid court that was created to attract legal business to Singapore and that incorporates many procedures that are typically found in arbitration proceedings.[25] BCS and Weber consented to the jurisdiction of the SICC, and they waived any right to object in those proceedings to that court's jurisdiction.[26]

Baker and the Singapore Defendants proceeded to trial in the SICC in November 2019.  The Singapore Defendants asserted a "no case to answer" defense—similar to a nonsuit in the United States, but with the party asserting the defense waiving its right to present evidence at trial.[27]  In April 2020, the SICC entered judgment in favor of Baker and against both BCS and Weber.[28]  The Singapore Court of Appeal affirmed the SICC's

---

[19]    *Id.*

[20]    *Id.* at ¶ 34.

[21]    *Id.* at ¶ 35.

[22]    *Id.* at ¶ 40.

[23]    *Id.* at ¶ 48.

[24]    *Id.* at ¶ 51.

[25]    *Id.*

[26]    Opposition 5:19-6:2.

[27]    *Id.* at 6:14-15.

[28]    *Id.* at 7:16-17.

judgment in January 2019, rendering that judgment final and non-appealable in Singapore.[29]

Following the entry of judgment, the SICC ordered the Singapore Defendants to account for the assets held by BCS and Weber for the benefit of Burnison's estate.[30] Baker disputed the accounting that the Singapore Defendants provided, and in December 2021 the SICC entered another judgment in favor of Baker that compelled the Singapore Defendants to pay to Baker, in his capacity as the executor of Burnison's estate, "tens of millions of dollars."[31]  Following appeal, Burnison's estate was awarded an additional $390,000, and the Singapore Defendants have thus far remitted approximately $35 million to Baker and Burnison's estate.[32]

In November 2021, Baker obtained from the SICC an anti-suit injunction against Weber and BCS, which ordered Weber and BCS to discontinue their collateral attack in this Court on the final judgments from Singapore.[33]  The Singapore Defendants appealed, and Baker prevailed.  Baker—on behalf of Burnison's estate—demanded that BCS comply with the anti-suit injunction.[34]  Stemming from actions taken by the parties in the instant action, in June 2023 Baker sought contempt remedies against BCS in the SICC (the "Contempt Proceeding").[35]  The SICC set a hearing pertaining to the Contempt Proceeding for September 6, 2023—one day prior to the date originally set for the hearing in this Court on Defendants' motion for summary judgment.[36]

## C.   The Procedural Posture of This Case

BCS filed its initial Complaint in this Court in August 2019, and it filed its operative Amended Complaint in April 2022.  In its Amended Complaint, BCS alleges that Baker and his co-Defendants BCS Pharma, Heika, Birka, GPS, and Grey Pacific Labs, LLC (collectively, "Defendants") participated in a conspiracy to usurp control

---

[29]   *Id.* at 8:5-7.

[30]   *Id.* at 8:14-15.

[31]   *Id.* at 8:16-19.

[32]   *Id.* at 8:19-24.

[33]   *Id.* at 8:26-9:2.

[34]   *Id.* at 9:2-5.

[35]   Motion 15:7-9.

[36]   *Id.* at 15:10-12.  This Court subsequently continued the hearing on Defendants' motion for summary judgment to September 21, 2023.  *See* Minute Order [ECF No. 202].

over, to convert, and otherwise to exploit assets to which Defendants have no rights.[37] BCS also pleads, in the alternative, claims for conversion and money had and received.[38]

BCS filed a motion to for leave to file a Fourth Amended Complaint in January 2023. The Court conducted a hearing on that motion two months later[39] and continued the matter to September 7, 2023—concurrently with the hearing on Defendants' motion for summary judgment. On July 14, 2023, BCS filed the instant Motion for an anti-suit injunction against Baker, and one week later BCS filed an *ex parte* application for a temporary restraining order ("TRO") seeking the same relief on an emergency basis.[40] This Court promptly denied BCS's *ex parte* application and declined to issue a TRO.[41] Thereafter, the parties stipulated to continue to September 21, 2023, the hearing on Defendants' motion for summary judgment and on BCS's motion for leave to file a Fourth Amended Complaint. BCS's instant Motion for an anti-suit injunction is fully briefed, and the Court conducted a hearing concerning the matter on August 11, 2023. The parties filed their supplemental briefs later that month.[42]

## III.  LEGAL STANDARD

"'A federal district court with jurisdiction over the parties has the power to enjoin them from proceeding with an action in the courts of a foreign country, although the power should be used sparingly.'" *E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 989 (9th Cir. 2006) (quoting *Seattle Totems Hockey Club, Inc. v. Nat'l Hockey League*, 652 F.2d 852, 855 (9th Cir. 1981)).

The Ninth Circuit has established a three-part inquiry for assessing a motion for an anti-suit injunction:

- "First, [courts] determine 'whether or not the parties and the issues are the same' in both the domestic and foreign actions, 'and whether or not the first action is dispositive of the action to be enjoined.'" *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 881 (9th Cir. 2012) (quoting *Gallo*, 446 F.3d at 991).

---

[37]    *See, e.g.*, Amended Complaint ¶ 12.

[38]    *See id.* at ¶¶ 209, 215, 218, & 220.

[39]    *See* Hearing re:  Pl.'s Mot. for Leave to File Fourth Am. Compl. [ECF No. 174].

[40]    *See* Pl.'s *Ex Parte* App. for TRO [ECF No. 197].

[41]    *See* Order Denying Pl.'s *Ex Parte* App. [ECF No. 199].

[42]    *See* BCS's Supplemental Brief; Defendants' Supplemental Brief.

- "Second, [courts] determine whether at least one of the so-called '*Unterweser* factors' applies." *Id.* (referring to *In re Unterweser Reederei GMBH*, 428 F.2d 888, 896 (5th Cir.1970), *aff'd on reh'g*, 446 F.2d 907 (5th Cir. 1971) (*en banc*) (*per curiam*), *rev'd on other grounds sub nom. M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1 (1972)).
- "Finally, [courts] assess whether the injunction's 'impact on comity is tolerable.'" *Id.* (quoting *Gallo*, 446 F.3d at 991).

"The *Unterweser* factors are a disjunctive list of considerations that may justify a foreign anti-suit injunction, first articulated by the Fifth Circuit . . . and adopted by [the Ninth Circuit]." *Id.* at 881-82.  Courts must consider "[whether the] foreign litigation . . . would (1) frustrate a policy of the forum issuing the injunction; (2) be vexatious or oppressive; (3) threaten the issuing court's *in rem* or *quasi in rem* jurisdiction; or (4) where the proceedings prejudice other equitable considerations."  *Gallo*, 446 F.3d at 990 (quoting *Seattle Totems*, 652 F.2d at 855).

## IV.  ANALYSIS

### A.      Applicability of the *Laker Airways* Interdictory Actions Test

At the hearing on the Motion and in its Supplemental Brief, BCS asserted that the test that this Court should apply for an anti-suit injunction is not the one argued in the papers and articulated in *Microsoft*, 696 F.3d at 881.  Instead, BCS maintains that the Court should follow the D.C. Circuit's instructions pertaining to interdictory anti-suit injunctions set forth in *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909 (D.C. Cir. 1984).[43]  As an initial point, neither BCS nor Defendants raised the *Laker Airways* test for interdictory anti-suit injunctions in their initial briefs;[44] nevertheless, the Court will address BCS's arguments regarding parallel versus interdictory foreign actions.

*Laker Airways* "represent[ed] a head-on collision between the diametrically opposed antitrust policies of the United States and United Kingdom."  *Id.* at 916.  On that point alone, *Laker Airways* is distinguishable from the instant conditions, in which Singapore is asserting its contempt powers against BCS and Weber.  *Laker Airways* was not a case in which two actions were litigated in parallel; instead, the parties there engaged in an "embarrassing race to judgment" in both the United States and the United Kingdom.  *Id.* at 928.  The D.C. Circuit determined that, *inter alia*, comity was not a factor in evaluating the motion for an anti-suit injunction in that case because the British

---

[43]      Minute Order re H'rg re:  the Motion [ECF No. 208]; *see* BCS's Supplemental Brief.

[44]      *See* Defendants' Supplemental Brief 17:9-11.

government was blatantly attempting to assert its own interests over those of American courts. *See id.* at 941 ("If we are guided by the ethical imperative that everyone should act as if his actions were universalized, then the actions of the British Executive in this particular matter scarcely meet the standard of Kant.").

Those circumstances are not present here. Although the Ninth Circuit has cited *Laker Airways* with approval in different contexts, it has not directed lower courts to differentiate between parallel or interdictory proceedings when applying the test for anti-sui injunctions. *See Microsoft*, 696 F.3d at 887 (discussing *Laker Airways* and comity considerations); *Gallo*, 446 F.3d at 994-95 (same). Accordingly, the Court is not convinced that the three-part test in *Microsoft* should be displaced by the D.C. Circuit's analysis in *Laker Airways*.

## B.     The Effect of This Case on the Singapore Action

The first step in deciding whether an anti-suit injunction is appropriate is to determine "whether or not the parties and the issues are the same, and whether or not the first action is dispositive of the action to be enjoined." *Applied Med. Distribution Corp. v. Surgical Co. BV*, 587 F.3d 909 (9th Cir. 2009) (citing *Gallo*, 446 F.3d at 991).

### 1.     Similarity of the Parties

"Perfect identity of parties is not required for an anti-suit injunction. Rather, it suffices that the parties be affiliated in such a way that their interests coincide." *Zynga, Inc. v. Vostu USA, Inc.*, 816 F. Supp. 2d 824, 828 (N.D. Cal. 2011).

Here, Baker contests only whether the issues were the same in the two actions. The Court finds sufficient overlap in the parties such that they are functionally the same in both this case and the Singapore action.[45]

### 2.     Similarity of the Issues

Because there is no dispute that the parties are functionally the same in this action and the Singapore action, the analysis turns to "whether or not . . . the issues are the same, and whether or not the first action is dispositive of the action to be enjoined." *Gallo*, 446 F.3d at 991; *see also Applied Medical Distribution*, 587 F.3d at 915 ("[T]he crux of the functional inquiry in the first step of the analysis is to determine whether the issues are the same in the sense that all the issues in the foreign action . . . can be resolved in the local action.").

---

[45]     Opposition 12:1-14:3.

BCS claims that the issues are the same because the SICC's anti-suit injunction "purports to restrain BCS from prosecuting this action with respect to formation, existence, or enforcement of the Purported Trust, and the Contempt Proceeding is the enforcement mechanism of the SICC Injunction."[46]  BCS asserts that the "[e]nforcement of a judgment in this action therefore would be dispositive of issues raised in the Singapore proceedings."[47]

Baker opposes the Motion by arguing that the parties are not the same and that, in a previous opposition to a motion to dismiss for forum *non conveniens*, BCS argued that the two lawsuits involve different subject matter.[48]  In that opposition, BCS claimed that "the pending litigation in Singapore concerns product rights to Ethocyn.  The suit here involves interference and conversion by Defendants stemming from a contract entered into by BCS Consulting and non-party NSE."[49]

Although it is true that the Singapore action and this case involve issues pertaining to Ethocyn-related rights, the only matter before the Court in this Motion is whether Baker should be enjoined from pursuing the Contempt Proceeding against BCS in Singapore.[50]  The Singapore action was fully adjudicated by the SICC, and all appeals were resolved in Baker's favor.[51]  BCS's characterization of the "Contempt Proceeding, the SICC Injunction, and this action address[ing] the same transactions involving the Ethocyn Rights" is incorrect,[52] because the SICC Injunction and the subsequent Contempt Proceeding are aimed solely at stopping BCS's collateral attack on the SICC's judgment.

In the anti-suit injunction that the SICC entered, that court ordered that BCS was restrained from prosecuting its case before this Court "insofar as such proceedings relate to the existence, validity and/or enforceability of the Trust in the Ethocyn Rights . . . and any issues relating to the reliance on and/or assertion of the said Trust or any issues

---

[46]     Motion 17:4-7.

[47]     *Id.* at 17:11-12.

[48]     Opposition 12:14-16.

[49]     Pl.'s Opp'n to Defs.' Mot. to Dismiss for Forum *Non Conveniens* (the "Forum Opposition")[ECF No. 24] 6:12-15.

[50]     Motion 2:7-11.

[51]     *Id.* at 14:3-10.

[52]     Reply 6:12-14.

litigated before the Singapore Courts[.]"[53]  However, the SICC's order specifically did
not restrain BCS:

> from pursuing claims against [Defendants in the United States action] for
> claims against [Baker] for allegedly holding himself out as an officer of [BCS]
> or for signing of the assignment agreement transferring the trademark rights,
> and the settlement agreement with [NSE], and for claims against [Heika] for
> allegedly willingly entering into the assignment agreement for the trademark
> rights knowing that [Baker] is not an officer of [BCS], or for claims related
> thereto, provided always that they do not relate to the existence, validity
> and/or enforceability of the Trust in the Ethocyn Rights and assets held on
> behalf of [Burnison and her Estate], and any issues relating on and/or
> assertion of the said Trust or any issues litigated before the Singapore
> Courts[.][54]

It is apparent that the issues in the SICC injunction and the instant Motion for an
anti-suit injunction against Baker are not the same.  While BCS attempts to portray the
Motion as an effort to resolve the same issues litigated in the SICC, the SICC's anti-suit
injunction specifically distinguished issues already litigated in Singapore from BCS's
claims before this Court.  Although BCS argues differently now, it was correct in its
opposition to the motion to dismiss for forum *non conveniens*—the issues *are* different.
Accordingly, this Court is not convinced that this action would be dispositive of the issues
raised in the Singapore proceedings.  *See Sun World, Inc. v. Lizarazu Olivarria*, 804
F. Supp. 1264, 1267 (E.D. Cal. 1992) (assessing whether the resolution of a U.S. action
would be dispositive of a parallel foreign action).

### 3.     Potential for an Advisory Opinion

An important issue that the parties ignore is whether an anti-suit injunction against
Baker would prevent Singapore's Contempt Proceeding from sanctioning BCS.  The
Contempt Proceeding does not concern the underlying litigation of Ethocyn-related
rights—as Defendants explain, the Singapore Defendants (including BCS) have already
satisfied the vast majority of the monetary portion of the judgment.[55]  The SICC's
injunction against BCS concerns what it perceives to be BCS's collateral attack on its
judgment here in the United States:

---

[53]     Motion, Ex. B ("Exhibit B") [ECF No. 193-2] JE 0383 ¶ 1.

[54]     *Id.* at JE 0384 ¶ 2.

[55]     Opposition 8:22-24.

> [W]e are of the view that many of the claims pursued by BCS in the
> Californian Proceedings amount to an attempt at relitigating matters already
> decided by this court, and thus vexatious and oppressive and amount to an
> abuse of process.  We also find that BCS's claims are vexatious and
> oppressive towards the [Burnison] Estate.  Moreover, these claims
> relitigating the same issues that have been decided by this court amount to a
> collateral attack of this court's Judgment.  This justifies the issuance of an
> [anti-suit injunction] against BCS, to restrain BCS from relitigating the
> subject-matter of the Suit against the [Burnison] Estate *and* the US
> Defendants through the Californian Proceedings.[56]

In that order concerning the anti-suit injunction, the SICC also specifically stated that
"we have also noted that not *all* of the claims pursued by BCS are attempts at relitigating
issues already decided by this court.  To that extent, BCS is allowed to pursue these
claims, which do not impinge on any findings and rulings contained in the Judgement of
this court."[57]  In that context, it is apparent that the Contempt Proceeding stands
separate from any claim before this Court by BCS against Defendants.

Even if this Court were to grant the Motion and enjoin Baker from prosecuting the
Contempt Proceeding against BCS in Singapore, it is far from certain that the SICC
would refrain from holding BCS in contempt.  Singapore has a common law-based legal
system in which its courts—much like those in the United States—have inherent powers
to hold parties in contempt.  *See Dandong v. Pinnacle Performance Ltd.*, 2011 WL 6156743
(S.D.N.Y. Dec. 12, 2011), *aff'd in part, remanded in part sub nom. Lam Yeen Leng v.
Pinnacle Performance Ltd.*, 474 F. App'x 810 (2d Cir. 2012) (collecting legal treatises on
Singaporean courts' contempt powers).

According to Singapore's Attorney-General's Chambers, "[c]ontempt of court
takes many forms and is essentially conduct that may impede the functionality of the
court."[58]  Parties may be held in contempt in Singapore for both interference with and
disobedience of court orders—with contempt by disobedience defined as a category
including "intentional disobedience of court orders as well as intentional breaches of
undertakings given to the court."[59]  "Under § 10(1) of the [Administration of Justice
(Protection)] Act [2016], the Court of Appeal and the High Court have the jurisdiction to

---

[56]   Exhibit B JE 0378 ¶ 91 (italics in original).

[57]   *Id.* at JE 0378 ¶ 92 (italics in original).

[58]   Attorney-General's Chambers, *Contempt of Court*, ¶ 1 https://www.agc.gov.sg/legal-processes/contempt-of-court (accessed Sept. 3, 2023).

[59]   *Id.* at ¶ 1(b).

try and power to punish for contempt of court."[60]  "There are two stages to commencing proceedings for contempt of court," consisting of both an application for leave to apply for an order of contempt and then an actual application for a contempt finding.[61]  "A hearing date will then be fixed for the court to hear both parties and to determine whether the person had committed contempt of court.  If the person is found guilty, the court may impose punishment for contempt of court."[62]

According to BCS, in June 2023 Baker requested an expedited Contempt Proceeding from the SICC against BCS, in addition to filing an amendment seeking an order of disqualification to bar Weber from serving as a director of BCS.[63]  In view of the facts that the Contempt Proceeding materials have already been filed and that the SICC set a hearing on the matter for September 6, 2023, it is unclear what relief this Court could provide to BCS by granting the Motion.  Regardless of whether Baker is enjoined by this Court from enforcing the SICC's anti-suit injunction against BCS, the SICC still possesses the authority to sanction BCS for its defiance of the SICC's orders.

Explained differently, granting the Motion would not provide BCS with the actual relief it seeks—namely, preventing the imposition of sanctions against BCS in Singapore's Contempt Proceeding.  "[F]ederal courts do not issue advisory opinions," but "instead decide only maters 'of a Judiciary Nature.'"  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citation omitted).  Accordingly, "a federal court may resolve only 'a real controversy with real impact on real persons.'"  *Id.* (citing *American Legion* v. *American Humanist Assn*, 139 S. Ct. 2067, 2103 (2019)).  Here, BCS has failed to show that enjoining Baker would materially alter the pending Contempt Proceeding in Singapore, nor has BCS explained how enjoining Baker from enforcing the judgment would stop the SICC from sanctioning BCS for violating the SICC's anti-suit injunction.[64]  *See Coal. for a Healthy California v. F.C.C.*, 87 F.3d 383, 386 (9th Cir. 1996) (dismissing the plaintiff's petition because it sought relief that the court was unable to give, thus rendering that relief "an advisory opinion prohibited under Article III of the Constitution").

---

[60]     *Id.* at ¶ 2.

[61]     *Id.* at ¶ 4(a)-(b).

[62]     *Id.* at ¶ 4(b).

[63]     Motion 15:7-14.

[64]     To be clear, this Court takes no position regarding whether BCS did or did not violate the SICC's anti-suit injunction nor whether any sanctions are or are not warranted.

## C.     The *Unterweser* Factors

Although the Court concludes that BCS's Motion flunks the first step of the anti-suit injunction analysis, the Motion also fails because BCS does not meet the requirements of any of the *Unterweser* factors.

### 1.     Violation of Public Policy

BCS contends that allowing Baker to enforce the SICC's anti-suit injunction frustrates U.S. public policy because Baker re-litigated an issue in Singapore that was already decided by a United States court and because Baker secured the SICC injunction through impermissible forum shopping.[65]

### a.     The SICC Contempt Proceeding

As a threshold issue, the Court is not convinced that BCS's Motion concerns the underlying issues of the Ethocyn litigation.  Although BCS argues that Baker is attempting to re-litigate an issue in Singapore that it claims was already decided in U.S. Bankruptcy Court,[66] the only matter currently being litigated is the Contempt Proceeding before the SICC.  A court's imposition of contempt sanctions—at least without a showing of procedural unfairness or lack of due process—does not violate public policy, because common law courts "have an 'inherent authority' to sanction 'bad faith' or 'willful misconduct,' even in the absence of express statutory authority to do so."  *In re Dyer*, 322 F.3d 1178, 1196 (9th Cir. 2003) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 42–47 (1991)).

BCS's argument on this point is even weaker, because Singapore courts possess statutory contempt authority in addition to the authority that arises under common law.[67] Instead of focusing on the Contempt Proceeding, BCS's Motion goes all-in on the underlying Ethocyn litigation, which resulted in a final judgment in Singapore.  Even if this Court was persuaded that Baker should have first filed his litigation here—in the Bankruptcy Court for the Central District of California—the issuance of the anti-suit injunction that BCS now seeks would do nothing to change the SICC's judgment, nor would it reverse the Singapore Defendants' payment to Baker of the monetary portion of the judgment.

---

[65]     *Id.* at 17:20-24.

[66]     *Id.*

[67]     *See* Attorney-General's Chambers, *Contempt of Court*, https://www.agc.gov.sg/legal-processes/contempt-of-court (accessed Sept. 3, 2023).

> b.      The U.S. Bankruptcy Case

BCS contends that Baker's SICC litigation was an impermissible collateral attack on the Bankruptcy Court's jurisdiction and that Baker violated the public policy prong of *Unterweser* by not first seeking relief before the Bankruptcy Court.[68]  BCS asserts that Baker violated certain portions of the Bankruptcy Court's order approving the Sale Agreement, including that:  (1) the sale was conducted at arm's length between the purchaser and debtor, and in good faith within the meaning of 11 U.S.C. § 363(m); and (2) the sale was free and clear of all liens, encumbrances, and interests in the property being sold under 11 U.S.C. § 363(f).[69]  BCS then asserts that the Singapore action was an impermissible "collateral attack that is shielded by *res judicata* principles" and that it was "precluded by the proscribed method of challenging bankruptcy orders."[70]

First, it is unclear why BCS did not seek relief before the Bankruptcy Court, which was the tribunal that approved the Sale Agreement.  *See In re Zetta Jet USA, Inc.*, 644 B.R. 12, 52 (Bankr. C.D. Cal. 2022) (the bankruptcy court issued an anti-suit injunction, finding that *res judicata* barred the trustee from pursuing its claims in Singapore); *In re Icenhower*, 398 B.R. 902, 910-11 (Bankr. S.D. Cal. 2008) (concerning a motion for an anti-suit injunction before a bankruptcy court).  Nor did BCS first seek relief before this Court. Indeed, district courts may withdraw cases or proceedings from bankruptcy courts for cause under 28 U.S.C. § 157(d), but BCS did not make such a request here.  *See Sec. Farms v. Int'l Bhd. of Teamsters, Chauffers, Warehousemen & Helpers*, 124 F.3d 999, 1008 (9th Cir. 1997) ("In determining whether cause exists, a district court should consider the efficient use of judicial resources, delay and costs to the parties, uniformity of bankruptcy administration, the prevention of forum shopping, and other related factors.").

Second, BCS has failed to show that the Bankruptcy Court retained exclusive jurisdiction over Ethocyn-related rights.  The Bankruptcy Court approved the Sale Agreement in October 1999 and explicitly stated that "[t]he Bankruptcy Court shall retain jurisdiction to the fullest extent necessary ***to consummate the transactions*** contemplated hereby and to resolve any disputes with respect thereto."[71]  That sale was consummated shortly after the Sale Agreement was approved, and in October 1999 Renslade NZ acquired the Ethocyn-related rights from Chantal Burnison for $325,000.[72] *See In re Lewis*, 515 B.R. 591, 595 (B.A.P. 9th Cir. 2014) (discussing the requirements for

---

[68]      Motion 19:12-20:14.

[69]      *Id.* at 18:14-17; *see also* Sale Agreement.

[70]      Motion 18:21-23.

[71]      Sale Agreement ¶ 16 (emphasis added).

[72]      *See* Defs.' Mot. for Summ. J, Joint Ex. 1 (the "SICC Judgment") [ECF No. 184-4] JE 0023 ¶ 22.

the consummation of a sale within the bankruptcy context, including that "this will typically involve payment"). The Ethocyn rights were then transferred multiple times among companies owned by Weber.[73] Because the sale of Ethocyn-related rights was consummated decades ago, there is no reasonable interpretation of the Sale Agreement in which BCS can show that the Bankruptcy Court still possessed jurisdiction, much less exclusive jurisdiction.

Finally, the SICC's analysis of the Bankruptcy Court's Sale Agreement did not violate public policy. Although BCS claims that the SICC "performed no meaningful analysis on its own subject matter jurisdiction to decide anew the nature of the Ethocyn Rights Transfer,"[74] the SICC's Judgment shows that it assessed the Bankruptcy Court's Sale Agreement and the resolution of the underlying Bankruptcy Case. The SICC considered "the parties' cases on the formation of a trust under California law" and evaluated California probate law and statutes on the matter.[75] The SICC concluded, based upon the evidence, that "Chantal [Burnison] intended to and did create a trust and it is recognizable under California law."[76] Further, the Singapore Defendants appealed the SICC's judgment, and Singapore's appellate court affirmed. While this Court does not now evaluate the merits of the SICC's decision, BCS has not shown that the SICC's analysis or judgment violated the public policy of the United States or California.

### c.    Forum Shopping

Next, BCS makes a strained argument that Baker inappropriately forum-shopped when it sued the Singaporean defendants in a Singapore court.[77] BCS argues that Baker attempted to evade the Bankruptcy Court's jurisdiction by filing the Singapore action, but, as explained above, Baker's litigation in Singapore did not violate public policy.[78] Although it may seem counterintuitive for BCS to argue that an American plaintiff suing a Singaporean defendant in Singapore constitutes forum shopping, BCS insists that Baker obtained an unfair advantage because: (1) Singapore does not recognize judicial estoppel; (2) the SICC did not analyze whether collateral estoppel barred Burnison's estate from relitigating whether Chantal Burnison retained an interest in Ethocyn-related rights; and

---

[73]    *See id.* at JE 0024 ¶ 23.

[74]    Motion 20:3-7.

[75]    SICC Judgment JE 0143 ¶ 231.

[76]    *Id.* at JE 0146 ¶ 240.

[77]    Motion 21:17-19.

[78]    *Id.* at 21:19-22.

(3) the SICC's "no case to answer" procedure did not consider evidence proffered by the Singapore Defendants.[79]

With respect to the larger question of what violates public policy in California in the context of international litigation, courts have held that the "public policy" exception to the comity doctrine "precludes application of a foreign state's law where to do so would violate California's public policy." *Wong v. Tenneco, Inc.*, 39 Cal. 3d 126, 135 (1985). "The standard, however, is not simply that the law is contrary to our public policy, but that it is so offensive to our public policy as to be 'prejudicial to recognized standards of morality and to the general interests of the citizens[.]'" *Id.* (quoting *Knodel v. Knodel*, 14 Cal. 3d 752, 765 (1975)). "Moreover, even where it is agreed that a foreign law offends public policy, it may still be applied in a limited context where the potential harm is minimal." *Id.* at 136.

Beginning with BCS's claim that Singapore's "no case to answer" procedures violate public policy here in the United States, the Court notes that BCS ***chose*** that strategy as its defense before the SICC. As stated in the Singapore Court of Appeal's order affirming the SICC's judgment, "[a]fter they gave their evidence, the appellants submitted that there was no case to answer and elected not to call evidence."[80] The Singapore Court of Appeal continued, "[t]he parties then filed their written submissions, and the registered US counsel filed their affidavits and submissions on California law."[81] As Defendants note in their Opposition, the Singapore Defendants told the SICC during trial that they "will be making a submission of no case to answer and we will be electing not to call any evidence."[82] In view of BCS's consent to the SICC's jurisdiction, as well as its decision voluntarily to file a "no case to answer" defense as part of its litigation strategy, this Court cannot conclude that Singapore's legal procedures violate public policy.

BCS also fails to show that Singapore's treatment of judicial and collateral estoppel issues violates public policy. Although BCS claims that Singapore does not recognize judicial estoppel, both the SICC and the Singapore Court of Appeal evaluated BCS's defenses under California law, and the Singapore Court of Appeal noted that "the principal focus of [the Singapore Defendants'] appeal is on the judicial estoppel claim."[83] Although BCS disagrees with the Singapore Court of Appeal's analysis of judicial

---

[79]    *Id.* at 22:11-22.

[80]    Defs.' Mot. for Summ. J., Joint Ex. Part C (the "ASI Appeal Judgment") [ECF No. 184-6] JE 0395 ¶ 13.

[81]    *Id.*

[82]    Opposition 15:19-21.

[83]    ASI Appeal Judgment JE 0403 ¶ 29.

estoppel, nothing in the order prejudicially offends California's standards of morality or the interest of its citizens. *See Wong*, 39 Cal. 3d at 135. Further, as the Singapore Court of Appeal noted, BCS "had submitted to the jurisdiction of the Singapore courts by appearing in the proceedings without objecting to or otherwise challenging the court's jurisdiction."[84]

Finally, BCS alleges that the SICC's failure to apply collateral estoppel violates public policy, because the issue of whether Ethocyn-related rights were transferred through an arm's-length transaction was already decided by the Bankruptcy Court.[85] BCS states that Chantal Burnison "actually litigated" the issue in the Bankruptcy Court by submitting a declaration stating that she would transfer the Ethocyn-related rights to Renslade NZ without retaining any interest in them.[86] The SICC addressed that issue, and it concluded that Chantal Burnison's "1999 declarations before the US Bankruptcy Proceedings . . . were false, but her subsequent statements were not. We move on to consider the effect of the false declarations on the enforceability of the Trust Agreement under both Singapore law and California law."[87] Although BCS disagrees with the decisions and conclusions of both the SICC and the Singapore Court of Appeal, BCS has not shown that the Singapore courts' interpretation of collateral estoppel violates California public policy, particularly in light of BCS's consent to the SICC proceedings.

### 2.      Presence of Vexatious or Oppressive Behavior

Anti-suit injunctions may be appropriate when foreign litigation is "vexatious or oppressive" and when the foreign litigation prejudices equitable considerations. *Microsoft*, 696 F.3d at 885. Here, as described above, neither BCS nor any of the Singapore Defendants objected to the SICC's jurisdiction at trial, and the Singapore Court of Appeal determined that the Singapore Defendants consented to its jurisdiction.[88] BCS's consent to the SICC's jurisdiction undermines its argument that the Singapore action was vexatious or oppressive. *See Mastronardi Int'l Ltd. v. SunSelect Produce (California), Inc.*, 437 F. Supp. 3d 772, 782 (E.D. Cal. 2020) (concluding that a foreign arbitration proceeding was neither vexatious nor oppressive "because the arbitration was contractually agreed to by the parties").

Further, as BCS stated in its opposition to Baker's motion to dismiss, "the pending litigation in Singapore concerns product rights to Ethocyn. The suit here

---

[84]      *Id.* at JE 0406-JE 0407 ¶ 37.

[85]      Motion 26:8-11.

[86]      *Id.* at 26:11-13.

[87]      SICC Judgment JE 0149 ¶ 249.

[88]      ASI Appeal Judgment JE 0406-JE 0407 ¶ 37.

involves interference and conversion by Defendants stemming from a contract entered
into by BCS Consulting and non-party NSE."[89]  In view of that admission, the Court
cannot find that the Singapore action was duplicative of this action, which BCS filed in
this Court.  *See id.* at 783 ("Foreign litigation may be enjoined when it causes substantial
inconvenience, unnecessary expense, and duplication of efforts.").

### 3.    Evaluation of Other Equitable Considerations

BCS did not address the third *Unterweser* factor.  Instead, it lists a few reasons why
the Contempt Proceeding violates other equitable considerations.[90]  To the extent that
those arguments rely on the previous factors that BCS raises, those arguments similarly
fail for the reasons described above.

"To determine whether a foreign action 'prejudice[s] other equitable
considerations,' courts in the Ninth Circuit analyze the 'convenience to the parties and
witnesses, the interest of the courts in promoting the efficient administration of justice,
and the potential prejudice to one party or the other[.]'"  *Zetta Jet USA*, 644 B.R. at 59
(quoting *Seattle Totems*, 652 F.2d at 856).

The Contempt Proceeding does not inhibit the equitable considerations of the
parties, nor does it violate the equitable considerations of this Court.  As stated above, the
SICC's anti-suit injunction specifically allowed for BCS to pursue certain claims before
this Court that were not adjudicated in the Singapore action.[91]  BCS attempts to append
equitable considerations to the other arguments in its instant anti-suit injunction Motion,
but it provides no pertinent legal authorities in support of its list of arguments.
Accordingly, BCS has not shown that other equitable considerations suggest that this
Court should issue an anti-suit injunction to prevent Baker from participating in the
Contempt Proceeding.

## D.    The Impact of the Requested Anti-Suit Injunction on Comity

When analyzing a motion for an anti-suit injunction, a court must "assess whether
the injunction's 'impact on comity is tolerable.'"  *Microsoft*, 696 F.3d at 886 (quoting
*Gallo*, 446 F.3d at 991).  Courts are not required to "calculate the precise quantum of the
injunction's interference with comity, but only [to] estimate whether any such
interference is so great as to be intolerable."  *Id.*  The Ninth Circuit instructs that
"comity is less likely to be threatened in the context of a private contractual dispute than

---

[89]    Forum Opposition 6:12-15.

[90]    Motion 31:22-32:18.

[91]    Exhibit B JE 0384 ¶ 2.

in a dispute implicating public international law or government litigants." *Id.* at 887. Further, "where two parties have made a prior contractual commitment to litigate disputes in a particular forum, upholding that commitment by enjoining litigation in some other forum is unlikely to implicate comity concerns at all." *Id.*

Here, while the Court denies the Motion because BCS has not prevailed under the first two prongs of the anti-suit injunction test, the Court also concludes that granting the Motion would be intolerable to international comity. As discussed above, BCS consented to Singapore's jurisdiction throughout the Singapore action, and both BCS and Weber are citizens of Singapore and are conducting business within Singapore. If the proverbial "shoe was on the other foot" and Defendants sought an anti-suit injunction in Singapore to prevent BCS from participating in this Court's hypothetical contempt proceedings against Defendants, this Court would view that action as an attempt to undermine this Court's authority over its own judgment. *See Gallo*, 446 F.3d at 994 ("Comity is 'the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws.'") (quoting *Hilton v. Guyot*, 159 U.S. 113, 164 (1895)).

BCS's previous admissions before this Court, in particular, implicate international comity, because BCS acknowledged that its actions contravene the SICC's injunction:

> The anti-suit injunction in Singapore is very clear by its terms. By standing right here right now pressing these claims my client is violating the anti-suit injunction in Singapore. And I think that arguably . . . I don't want to fully say that we are necessarily violating it in full. But I think that there's a strong argument that we are. And there's considerations that have come into play that could potentially, if the Singapore Court were to find that this is in violation of the anti-suit injunction, could potentially subject my client to various felonies in Singapore. There's no question about that.[92]

When this Court asked BCS's counsel whether "[BCS] wants to proceed in this Court and will take its chances with potential violations of the [Singapore court's] anti-suit injunction[,]" BCS's counsel responded, "I think that's right, your honor."[93] In view of those statements, the Contempt Proceeding against BCS should be interpreted as the SICC's legitimate exercise of its jurisdiction over BCS. *See Michaelson v. United States* ex rel. *Chicago, St. P., M., & O.R. Co.*, 266 U.S. 42, 65 (1924) ("That the power to punish for contempts is inherent in all courts, has been many times decided and may be

---

[92]   March 3, 2023, Hr'g Tr. [ECF No. 190] 6:20-7:6.

[93]   *Id.* at 14:13-16.

regarded as settled law.  It is essential to the administration of justice.").  Any attempt by this Court to undermine that jurisdiction would be intolerable to international comity.  Thus, BCS also fails to meet the third prong of the test for an anti-suit injunction.

**E.    BCS's Request for Alternative Relief**

BCS requests that if this Court denies its instant Motion for an anti-suit injunction against Baker, then, in the alternative, this Court should grant a TRO against Baker's enforcement of the SICC Injunction until this Court reaches a decision on Defendants' pending motion for summary judgment.[94]  The Motion is silent regarding why this Court should issue a TRO in the event that the anti-suit injunction is denied, or why that more limited remedy may be preferable to the anti-suit injunction.  Accordingly, to the extent that the Motion seeks the issuance of a TRO, it is **DENIED**.

## V.  DISPOSITION

For the foregoing reasons, the Court hereby **ORDERS** that BCS's instant Motion for an anti-suit injunction is **DENIED**.

**IT IS SO ORDERED.**

Dated:    September 5, 2023

John W. Holcomb
UNITED STATES DISTRICT JUDGE

---

[94]    Motion 2:11-14.